IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TOMMY CARROLL DALTON and, | ) |
| SHIRLEY JEAN DALTON, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 10-113-SLR-SRF |
| | ) |
| 3M COMPANY, et al., | ) |
| | ) |
| Defendants. | ) |

## REPORT AND RECOMMENDATION

### I.    INTRODUCTION

Presently before the court in this diversity action are the motions for summary judgment of Defendants Crane Co. ("Crane") (D.I. 44), and Foster Wheeler Energy Corporation ("Foster Wheeler") (D.I. 38) (collectively, "Defendants").[1] Tommy Carroll Dalton and Shirley Jean Dalton (the "Plaintiffs") oppose Defendants' Motions. (D.I. 53) For the reasons which follow, I recommend that the court GRANT Foster Wheeler's motion for summary judgment, and GRANT IN PART and DENY IN PART Crane's motion for summary judgment.

### II.    BACKGROUND

#### A. Procedural History

The Plaintiffs filed this action in the Superior Court of the State of Delaware on October 1, 2009. (D.I. 1, Ex. 1) On February 12, 2010, the case was removed to the United States District Court for the District of Delaware. (D.I. 1) The matter subsequently was transferred to the United

---

[1] Defendants CBS Corporation ("Westinghouse"), Ingersoll-Rand Company, and Warren Pumps LLC also filed motions for summary judgment. (D.I. 36, 40, 37) However, the court was advised verbally that those parties subsequently settled with the Plaintiffs. (*See* 11/27/12 Tr. at 2, 26; D.I. 80) Therefore, their respective motions are moot.

States District Court for the Eastern District of Pennsylvania (the "MDL Court"), which oversees the federal Multi-District Litigation Asbestos Docket. (D.I. 23) Following the close of discovery, the Defendants filed motions for summary judgment.

The MDL Court found that there were issues of material fact in dispute concerning product identification, and therefore, denied the Defendants' summary judgment motions. *See Dalton v. 3M Co. (Crane)*, 2011 WL 5881011, at *1 (E.D. Pa. July 29, 2011); *Dalton v. 3M Co. (Foster Wheeler)*, 2011 WL 5881178, at *1 (E.D. Pa. July 29, 2011). In addition to denying the motions, the MDL Court held that Mississippi law, rather than maritime law, governs this matter. The MDL Court explained, "[m]aritime law does not apply in this case since Mr. Dalton did not work on navigable waters and because the potential of any alleged exposures, which occurred on land, to disrupt maritime commerce is too tenuous." *Dalton v. 3M Co. (Crane)*, 2011 WL 5881011, at *1 n.1 (citing *Conner v. Alfa Laval, Inc.*, 799 F. Supp. 2d 455, 459 (E.D. Pa. 2011)).[2] "The alleged exposures which are relevant to this [case] occurred in Mississippi. Therefore, this Court will apply Mississippi law . . . ." *Id.* Thereafter, Crane filed a motion for reconsideration, arguing that maritime law should apply. The MDL Court denied Crane's motion. (D.I. 77, Ex. B)

The MDL Court remanded the case back to this court, with the recommendation that the matter be transferred to Mississippi, pursuant to 28 U.S.C. § 1404(a), because the Defendants raised a particular defense that "is an unsettled issue of Mississippi law." *See Dalton v. 3M Co. (Crane)*, 2011 WL 5881011, at *1 n.1; *Dalton v. 3M Co. (Foster Wheeler)*, 2011 WL 5881178, at *1 n.1.

---

[2] *See also Dalton v. 3M Co. (Foster Wheeler)*, 2011 WL 5881178, at *1 n.1 (citing *Conner*, 799 F. Supp. 2d at 459).

Foster Wheeler and Crane filed the pending motions for summary judgment on March 19, 2012, and March 29, 2012, respectively. (D.I. 38, 44) On May 1, 2012, United States District Court Judge Sue L. Robinson referred this case to the undersigned, pursuant to 28 U.S.C. § 636, to manage all pretrial proceedings up to and including the pretrial conference. (D.I. 62)

On November 27, 2012 this court held oral argument, and subsequently ordered the parties to submit supplemental legal memoranda addressing: (1) the legal authority supporting and opposing this court's reconsideration of the MDL Court's choice of law ruling, and (2) the parties' respective positions on transferring venue in this case to Mississippi. (D.I. 74) The parties filed their submissions with the court on December 12, 2012. (D.I. 75, 76, 77)

### B. Facts

The Plaintiffs filed this personal injury action against Defendants Crane and Foster Wheeler[3] alleging that Tommy Carroll Dalton ("Mr. Dalton") developed mesothelioma as a result of exposure to asbestos-containing products during his career at Ingalls Shipyard in Pascagoula, Mississippi, from 1958 to 2000. (D.I. 1, Ex. 1 at 5) The Plaintiffs assert that the Defendants manufactured, sold or distributed the products at issue, which were designed to incorporate asbestos-containing gaskets, packing, and insulation. (*Id.*, Ex. 1 at 11-12)

Mr. Dalton was deposed on January 13 and 14, 2012 in order to preserve his testimony for trial, and for discovery purposes. (D.I. 53 at 2) Mr. Dalton testified that his asbestos exposure occurred over a ten year period, from 1959 to 1969, while employed at Ingalls Shipyard in the Quality Assurance Department. (D.I. 1, Ex. 3-1 at 17-18) Mr. Dalton started as a Quality Assurance ("QA") trainee before becoming a QA inspector in late 1959. (*Id.*, Ex. 3-2 at 39-41) He worked as a QA inspector for approximately four years, where he inspected the installation,

---

[3] The Plaintiffs named in the Complaint a number of additional defendants that have since been terminated from this action. (D.I. 1, Ex. 1)

3

testing and maintenance of piping and machinery for submarines. (*Id.*, Ex. 3-2 at 39-41; *Id.*, Ex. 3-1 at 18-21) The machinery equipment included turbines, steam generators, pumps and valves. (*Id.*, Ex. 3-1 at 23) Later, from 1964 to 1969, Mr. Dalton was a QA manager. (*Id.*, Ex. 3-2 at 61) As a QA manager, Mr. Dalton oversaw the Quality Assurance program on submarines being built and supervised the QA inspectors. (*Id.*, Ex. 3-2 at 60-62)

### 1. Defendant Foster Wheeler

Mr. Dalton identified Foster Wheeler as a brand of steam generators (or "boilers") that were present at Ingalls Shipyard. (*Id.*, Ex. 3-3 at 220-21; *Id.*, Ex. 3-1 at 48) Foster Wheeler's steam generators arrived at the shipyard "bare metal," with nothing attached to them and no insulation. (*Id.*, Ex. 3-3 at 194, 223-26) External asbestos insulation was applied to the steam generators after they were installed upon ships. (*Id.*, Ex. 3-3 at 223; *Id.*, Ex. 3-1 at 41-45) Mr. Dalton was present during the insulation process, which generated asbestos dust. (*Id.*, Ex. 3-1 at 42-43)

### 2. Defendant Crane

Mr. Dalton identified Crane as a brand of pumps and valves that were present at Ingalls Shipyard. (*Id.*, Ex. 3-1 at 39, 59) He testified about the products, individually.

#### i. Crane Valves

Crane valves arrived at Ingalls Shipyard bare metal, with nothing attached to them and no insulation. (*Id.*, Ex. 3-2 at 138) External asbestos insulation was added to Crane valves after they were installed upon vessels, and Mr. Dalton was exposed to this insulation. (*Id.*, Ex. 3-1 at 49-53; *Id.*, Ex. 3-2 at 145) The Plaintiffs admit that Crane did not supply the external asbestos insulation applied to its valves. (*See* 11/27/12 Tr. at 38) Apart from the outer insulation on Crane valves, there was nothing in the valves that Mr. Dalton associated with asbestos. (D.I. 1, Ex. 3-2 at 146)

The body of the valve was made of metal, and only the insulation, not the inner packing or gaskets, caused Mr. Dalton to be exposed to asbestos. (*Id.*, Ex. 3-2 at 156-57)

### ii. Crane Pumps

Crane pumps, like Crane valves, arrived at the shipyard bare metal, without external insulation. (*Id.*, Ex. 3-2 at 161) External asbestos insulation was added to Crane pumps after they were installed upon vessels. (*Id.*, Ex. 3-1 at 26-30, 39; *Id.*, Ex. 3-2 at 161) The Plaintiffs admit that Crane did not supply the external asbestos insulation. (*See* 11/27/12 Tr. at 38) Mr. Dalton was present during the insulation process, which created asbestos dust. (D.I. 1, Ex. 3-1 at 27-28)

Mr. Dalton testified that Crane pumps were installed upon "all of [the ships]" on which he worked. (*Id.*, Ex. 3-2 at 159, 161-62; *Id.*, Ex. 3-1 at 19-20, 23-24, 39) When pumps failed inspection, they required removal and replacement of their internal gaskets and/or packing. (*Id.*, Ex. 3-1 at 28-29; *Id.*, Ex. 3-2 at 161-62) According to Mr. Dalton, the internal gaskets and packing were made out of asbestos. (*Id.*, Ex. 3-1 at 36-37). Mr. Dalton was present during the pump repair process, and testified that the removal and replacement of gaskets and packing from failed pumps generated asbestos dust. (*Id.*, Ex. 3-1 at 30-33) Mr. Dalton remembered having repaired Crane pumps specifically, but did not recall whether he had worked with the packing inside Crane pumps. (*Id.*, Ex. 3-2 at 159, 161-62)

### III. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence

exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (citations omitted). In determining whether a genuine issue of material fact exists, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000) (citing *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990)).

If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## IV.    DISCUSSION

### A. Preliminary Issues

The court must resolve the preliminary issues of transfer of venue and choice of law before addressing the substantive merits of Defendants' motions for summary judgment. The

6

court, through its November 28, 2012 Order, provided the parties with an opportunity to assert their respective positions on these matters. (D.I. 74)

### 1. Transfer of Venue

The transfer of venue issue stems from a recommendation by the MDL Court that this court transfer the present case to Mississippi, on the ground that Mississippi courts have not yet addressed a particular defense raised by the Defendants in the context of asbestos litigation.[4] The Plaintiffs oppose transfer of venue to Mississippi and insist that this matter remain in the District of Delaware. (D.I. 77 at 4-5) Foster Wheeler similarly maintains that "this case is properly before the Court." (D.I. 75 at 5) In addition, the Plaintiffs and Foster Wheeler note that, notwithstanding the MDL Court's transfer recommendation, the parties to this litigation have neither contested federal jurisdiction nor requested transfer of venue. (*Id.*; D.I. 77 at 4) Crane takes no position on transfer of venue and defers to the court's discretion. (D.I. 76 at 3)

Transfer of venue is governed by 28 U.S.C. § 1404. Section 1404(a) provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). This provision "was intended to vest district courts with broad discretion to determine, on an individualized, case-by-case basis, whether convenience and fairness considerations weigh in favor of transfer." *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 883 (3d Cir. 1995) (citing *Stewart Org. v. Ricoh Corp.*, 487 U.S. 22, 30-31 (1988)).

---

[4] *See Dalton v. 3M Co.* (*Crane*), 2011 WL 5881011, at *1 ("As Mississippi courts have not addressed the bare metal defense in the asbestos context, this Court will remand that issue to the transferor court with the suggestion that the case be transferred to Mississippi . . . .").

In the present case, transfer of venue would not meaningfully advance the litigation. The parties have expressed that they disfavor or hold no firm position on transferring this case to Mississippi, notwithstanding the MDL Court's suggestion. Therefore, I recommend that this matter remain in the District of Delaware.

## 2. The MDL Court's Choice of Law Ruling

The MDL Court determined that Mississippi law, rather than maritime law, applies in this matter because "[t]he alleged exposures which are relevant to this [case] occurred in Mississippi." *Dalton v. 3M Co. (Crane)*, 2011 WL 5881011, at *1 n.1. Foster Wheeler does not contest the MDL Court's determination.[5] (D.I. 75 at 1) However, Crane argues the choice of law ruling is erroneous because "subsequent opinions demonstrate that the MDL [] Court would now reach a different result and apply maritime law to Plaintiffs' claims." (D.I. 76 at 3) The Plaintiffs counter that Crane's argument "is an improper attempt to rehear an issue settled by the MDL court." (D.I. 53 at 18) The Plaintiffs cite the MDL Court's order denying Crane's motion for reconsideration and emphasize the MDL Court's rationale that its choice of law ruling "was based on 'the facts of this case.'" (D.I. 77 at 3; *Id.*, Ex. B)

I recommend that the court decline to reconsider the MDL Court's decision and follow its choice of law ruling, pursuant to the law of the case doctrine. "As most commonly defined, the doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."[6] *Arizona v. California*, 460 U.S.

---

[5] Foster Wheeler notes that it "did not move for summary judgment under maritime law, nor argue that the MDL Court erred in determining that federal maritime law was inapplicable." (D.I. 75 at 1) According to Foster Wheeler, the principles of maritime law and Mississippi law, as applied to Plaintiffs' claims, are identical, and neither body of law subjects Foster Wheeler to liability. (*Id.*)

[6] This court similarly has held that "'judges of coordinate jurisdiction sitting [in] the same court and in the same case should not overrule the decisions of each other.'" *Coca-Cola Bottling Co. v.*

605, 816 (1983) (citation omitted). "The '[l]aw of the case rules have developed to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit.'" *In re Pharm. Benefit Managers Antitrust Litig.*, 582 F.3d 432, 439 (3d Cir. 2009) (alteration in original) (quoting *Casey v. Planned Parenthood of Se. Pa.*, 14 F.3d 848, 856 (3d Cir. 1994)). The Third Circuit has observed that the law of the case doctrine "'is particularly applicable to multidistrict litigation in which the presence of a large number of diverse parties might otherwise result in constant relitigation of the same legal issue.'"[7] *In re Pharm. Benefit Managers*, 582 F.3d at 443 (citation omitted). "[A] 'Return to Go' card [should not] be dealt to parties involved in MDL transfers."[8] *Id.* at 441.

Importantly, the law of the case doctrine "does not restrict a court's power but rather governs its exercise of discretion.'" *Id.* (quoting *Pub. Interest Research Grp. v. Magnesium Elektron*, 123 F.3d 111, 116 (3d Cir. 1997)). The Supreme Court has explained, in this regard,

> [a] court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance, although as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would make a manifest injustice.

*Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988) (citing *Arizona*, 460 U.S. at 618 n.8). The Third Circuit has "recognized several [additional] 'extraordinary circumstances' that warrant a court's reconsideration of an issue decided earlier in the course of litigation." *Pub.*

---

*Coca-Cola Co.*, 769 F. Supp. 671, 703 (D. Del. 1991) (quoting *TCF Film Corp. v. Gourley*, 240 F.2d 711, 713 (3d Cir. 1957)).

[7] *See also Hayman Cash Register Co. v. Sarokin*, 669 F.2d 162, 169 (3d Cir. 1982) ("A disappointed litigant should not be given a second opportunity to litigate a matter that has been fully considered by a court of coordinate jurisdiction, absent unusual circumstances.").

[8] The Third Circuit in *In re Pharm. Benefit Managers* found "nothing in the text of 28 U.S.C. § 1407, the Multidistrict litigation transfer statute, that authorizes a transferee judge to vacate or modify an Order of a transferor judge." *In re Pharm. Benefit Managers*, 582 F.3d at 440.

*Interest Research Grp.*, 123 F.3d at 116-17. Specifically, the law of the case doctrine "does not preclude a court from revisiting its own decisions or one of a coordinate court where (1) new evidence is available or (2) a supervening new law has been announced."[9] *In re Pharm. Benefit Managers*, 582 F.3d at 439 (citing *Pub. Interest Research Grp.*, 123 F.3d at 117).

In the present case, Crane does not assert an extraordinary circumstance that warrants reconsideration of the MDL Court's choice of law ruling and, therefore, the court should apply Mississippi law. According to Crane, the MDL Court's ruling is "clear error" (D.I. 76 at 1) because "subsequent opinions demonstrate that the MDL [] Court would now reach a different result and apply maritime law to Plaintiffs' claims." (*Id.* at 3) Crane's argument is not persuasive, for several reasons.

Crane fails "to persuade [the court] not only that [the MDL Court's] prior decision [is] wrong, but that it [is] clearly wrong." *In re City of Phila. Litig.*, 158 F.3d 711, 720-21 (3d Cir. 1998). Crane relies erroneously upon *Deuber v. Asbestos Corp. Ltd.*, 2011 WL 6415339 (E.D. Pa. Dec. 2, 2011), among other cases, to convince this court "that the MDL [] Court would now reach a different result" and find that maritime law applies. (D.I. 76 at 3) In *Deuber*, the MDL Court held that maritime law applied to the plaintiff's claims of asbestos exposure from insulation on ships docked at a shipyard. *See Deuber*, 2011 WL 6415339, at *1. According to Crane, "Mr. Dalton's alleged exposures are factually indistinguishable from those in *Deuber*," and "[a]s such, under established precedent, maritime law applies." (D.I. 44 at 6) Notably, however, the MDL Court entered an Order denying Crane's motion for reconsideration, which

---

[9] The Third Circuit has been "careful to caution that if a 'trial judge decides to change or explain an earlier ruling, he should state his reasons on the record' and also 'take appropriate steps so that the parties are not prejudiced by reliance on the prior ruling.'" *In re Pharm. Benefit Managers Antitrust Litig.*, 582 F.3d at 439 (quoting *Swietlowich v. County of Bucks*, 610 F.2d 1157, 1164 (3d Cir. 1979)).

argued that maritime law should apply in this case, more than one month *after* issuing *Deuber*.[10]

(*See* D.I. 77, Ex. B) Therefore, no compelling reasons favor disturbing the MDL Court's ruling on the choice of law issue.

Furthermore, even assuming, *arguendo*, that the MDL Court's ruling is erroneous, Crane fails to explain why or even assert that "adherence to [the MDL Court's] decision would create manifest injustice."[11] *In re City of Phila. Litig.*, 158 F.3d at 720-21.

As the Supreme Court has explained, reconsideration of a prior decision is warranted only where the decision is both erroneous and creates manifest injustice. *See Christianson*, 486 U.S. at 816. In the present case, Crane has not established either element. Moreover, the Third Circuit has held that:

> Adherence to law of the case principles *is even more important in this context where the transferor judge and the transferee judge are not members of the same court*. Here, the principles of comity among courts of the same level of the federal system provide a further reason why the transferee court should not independently re-examine an issue already decided by a court of equal authority.

*Hayman Cash Register Co.*, 669 F.2d at 169 (emphasis added) (citations omitted). Thus, the court should decline to reconsider the MDL Court's ruling, and apply Mississippi law.

### B. Mississippi Law

A federal court sitting in diversity is "required to apply the substantive law of the state whose laws govern the action." *Robertson v. Allied Signal*, 914 F.2d 360, 378 (3d Cir. 1990).

---

[10] The MDL Court issued *Deuber* on December 2, 2011, and denied Crane's motion for reconsideration on January 3, 2012 (D.I. 77, Ex. B).

[11] In fact, Crane's own assertions undermine the notion that application of Mississippi law in this case would create manifest injustice. Crane's asserts, albeit with respect to transfer of venue, that "maritime law should be applied to Plaintiffs' claims, so the issue of whether to transfer venue to Mississippi should be moot. Regardless, *Mississippi law is in accord with maritime law*, and this Court can interpret Mississippi law on the relevant issues the same as a district court sitting in Mississippi." (D.I. 76 at 3 (emphasis added))

Mississippi law governs the pending action, consistent with the MDL Court's determination. "In the absence of controlling authority by the [Mississippi] Supreme Court, we must predict how it would rule if faced with the issue." *Lomando v. United States*, 667 F.3d 363, 385 (3d Cir. 2011) (citing *Spence v. ESAB Grp., Inc.*, 623 F.3d 212, 216 (3d Cir. 2010)).

### 1.  The Bare Metal Defense

In the present case, the Defendants assert that they cannot be held liable for Mr. Dalton's injuries because they neither manufactured nor supplied the products that allegedly caused Mr. Dalton to become exposed to asbestos. This proposition is known commonly as the "bare metal defense."[12] *See Conner*, 842 F. Supp. 2d at 793. The bare metal defense relates to defendants in asbestos cases that "manufactured so-called 'bare-metal' products that contained or were later encapsulated in asbestos." *Id.* The defense shields manufacturers from liability "for injuries caused by asbestos components, such as insulation, gaskets, and packing, that were incorporated into their products or used as replacement parts, but which they did not manufacture or distribute." *Id.* at 796.

The majority of courts embrace the principles of the bare metal defense and refuse to impose liability upon manufacturers for the dangers associated with asbestos-containing products manufactured and distributed by other entities. *See, e.g.*, *Lindstrom v. A-C Prod. Liab. Trust*, 424 F.3d 488, 495 (6th Cir. 2005); *Conner*, 842 F. Supp. 2d at 801; *Surre v. Foster Wheeler LLC*, 831 F. Supp. 2d 797, 801 (S.D.N.Y. 2011); *Niemann v. McDonnell Douglas Corp.*, 721 F. Supp. 1019, 1030 (S.D. Ill. 1989); *O'Neil v. Crane Co.*, 266 P.3d 987, 997-98 (Cal. 2012); *Taylor v. Elliott Turbomachinery Co.*, 90 Cal. Rptr. 3d 414, 429 (Cal. Ct. App. 2009); *In re Asbestos Litig.* (*Howton*), 2012 WL 1409011, at *1 (Del. Super. Ct. Apr. 2, 2012); *In re Asbestos Litig.* (*Wolfe*),

---

[12] The bare metal defense is also referred to as the "component parts defense." *See In re Asbestos Litig.* (*Howton*), 2012 WL 1409011, at *1 (Del. Super. Ct. Apr. 2, 2012).

2012 WL 1415706, at \*3-4 (Del. Super. Ct. Feb. 28, 2012); *Rumery v. Garlock Sealing Techs.*,
2009 Me. Super. LEXIS 73 (Me. Super. Ct. Apr. 24, 2009); *Braaten v. Saberhagen Holdings*,
198 P.3d 493, 498-99 (Wash. 2008); *Simonetta v. Viad Corp.*, 197 P.3d 127, 134-135 (Wash.
2008).

Mississippi courts have not addressed the issue of whether manufacturers may be held
liable for injuries caused by asbestos-containing products they did not manufacture or supply.
*See, e.g., Dalton v. 3M Co. (Crane)*, 2011 WL 5881011, at \*1 n.1 (explaining that the "bare
metal defense is an unsettled issue of Mississippi law"). Therefore, this court must predict how
the Supreme Court of Mississippi would rule on the issue. *See Lomando*, 667 F.3d at 385.

> In making this prediction, we look to "decisions of state intermediate appellate
> courts, of federal courts interpreting that state's law, and of other state supreme
> courts that have addressed the issue," as well as to "analogous decisions,
> considered dicta, scholarly works, and any other reliable data tending
> convincingly to show how the highest court in the state would decide the issue at
> hand."

*Id.* (quoting *Spence*, 623 F.3d at 216-17). *See also Norfolk S. Ry. Co. v. Basell USA Inc.*, 512
F.3d 86, 91-92 (3d Cir. 2008). "'[R]elevant state precedents must be scrutinized with an eye
toward the broad policies that informed those adjudications, and to the doctrinal trends which
they evince.'" *Holmes v. Kimco Realty Corp.*, 598 F.3d 115, 118 (3d Cir. 2010) (alteration in
original) (quoting *McKenna v. Ortho Pharm. Corp.*, 622 F.2d 657, 662 (3d Cir. 1980)). As set
forth below, there are two areas of Mississippi law that provide guidance in determining whether
the Mississippi Supreme Court would adopt the bare metal defense.

### 2.  Product Identification Under Mississippi Law

In asbestos litigation in Mississippi, the "frequency, regularity, and proximity" standard
is used "'to show product identification of the defendants' actual products, exposure of the
plaintiffs to those products, and proximate causation as to the injuries suffered by the plaintiffs.'"

*Phillips 66 Co. v. Lofton*, 94 So. 3d 1051, 1063 (Miss. 2012) (quoting *Monsanto Co. v. Hall*, 912 So. 2d 134, 137 (Miss. 2005)). In order to survive a motion for summary judgment in asbestos litigation, the plaintiff must show: (1) he was exposed to a particular asbestos-containing product made by the defendant, (2) with sufficient frequency and regularity, (3) in proximity to where the plaintiff actually worked, (4) such that it is probable that the exposure to the defendant's product caused the plaintiff's injuries. *Gorman-Rupp Co. v. Hall*, 908 So. 2d 749, 757 (Miss. 2005). *See also Monsanto*, 912 So. 2d at 136-37. The MDL Court applied this standard and determined there are genuine issues of material fact in dispute relative to the liability of Crane and Foster Wheeler. *See Dalton v. 3M Co. (Crane)*, 2011 WL 5881011, at *1 n.1; *Dalton v. 3M Co. (Foster Wheeler)*, 2011 WL 5881178, at *1 n.1.

### 3.  Product Liability Actions Under Mississippi Law

An analysis of current product liability law in Mississippi serves as a benchmark for determining whether the principles of the bare metal defense comport with controlling jurisdictional authority.

Product liability actions in Mississippi are governed by the Mississippi Products Liability Act ("MPLA"), Miss. Code Ann. § 11-1-63, which provides, in pertinent part:

> (a) The manufacturer or seller of the product shall not be liable if the claimant does not prove by the preponderance of the evidence that at the time the product left the control of the manufacturer or seller:
>
> (i) 1. The product was defective because it deviated in a material way from the manufacturer's specifications or from otherwise identical units manufactured to the same manufacturing specifications, or
>
> 2. The product was defective because it failed to contain adequate warnings or instructions, or
>
> 3. The product was designed in a defective manner, or
>
> 4. The product breached an express warranty or failed to conform to other express factual representations upon which the claimant justifiably relied in electing to use the product; and
>
> (ii) The defective condition rendered the product unreasonably dangerous to the user or consumer; and

(iii) The defective and unreasonably dangerous condition of the product
proximately caused the damages for which recovery is sought.

Miss. Code Ann. § 11-1-63(a). The Supreme Court of Mississippi has summarized this rule as

follows:

A plaintiff has the burden of showing that the defect that allegedly was the
proximate cause of injury existed at the time that the product left the hands of the
manufacturer, and that the defect rendered the product unreasonably dangerous.
Accordingly, the proof must support that no material change in that product
occurred after leaving the manufacturer's control.

*Clark v. Brass Eagle, Inc.*, 866 So. 2d 456, 461 (Miss. 2004). *See also 3M Co. v. Johnson*, 895

So. 2d 151, 165 (Miss. 2005).

Mississippi follows the strict liability approach for defective products set forth in

Restatement (Second) of Torts § 402A. *See, e.g.*, *Scordino v. Hopeman Bros.*, 662 So. 2d 640,

642 (Miss. 1995); *Coca Cola Bottling Co. v. Reeves*, 486 So. 2d 374, 377 (Miss. 1986); *State

Stove Mfg. Co. v. Hodges*, 189 So. 2d 113, 118 (Miss. 1966), *cert. denied*, 386 U.S. 912 (1967).

Section 402A defines who may be liable for a defective product as follows:

(1) One who sells any product in a defective condition unreasonably
dangerous to the user or consumer or to his property is subject to liability for
physical harm thereby caused to the ultimate user or consumer, or to his property,
if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without
substantial change in the condition in which it is sold.

Restatement (Second) of Torts § 402A. "The statement of the rule makes it obvious that strict

liability for injury caused by a defective product is not to be imposed on one who neither

manufactures nor sells the products."[13] *Harmon v. National Auto. Parts Ass'n*, 720 F. Supp. 79,

---

[13] This rationale applies equally in the context of negligent design/manufacture claims, where a
product's design or manufacturing defect causes injury. *See Harmon*, 720 F. Supp. at 80 ("[I]t is
[] clear that liability for the negligent design or manufacture of a product ordinarily cannot be
imposed on one who neither designed nor manufactured the product." (citing *State Stove Mfg.
Co.*, 189 So. 2d at 118)).

80 (N.D. Miss. 1989). *See also Scordino*, 662 So. 2d at 643 ("The applicability of the strict liability doctrine depends upon, among other things, whether the defendant is a manufacturer[14] or seller[15] in the business of selling a defective product." (citing *Harmon*, 720 F. Supp. at 80)). The rationale underlying strict liability in § 402A is that:

> [T]he seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; that the public has the right to and does expect, in the case of products which it needs and for which it is forced to rely upon the seller, that reputable sellers will stand behind their goods; that public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained; and that the consumer of such products is entitled to the maximum of protection at the hands of someone, and the proper persons to afford it are those who market the products.

§ 402A cmt. c.

In the present case, the Plaintiffs assert that the Defendants are liable for Mr. Dalton's injuries for inadequate warning/failure to warn, under Miss. Code Ann. § 11-1-63(a)(i)(2). (D.I. 1, Ex. 1 at 11-12; D.I. 53 at 1-2)

A product may be found defective under Mississippi law if it "fail[s] to contain adequate

---

[14] A manufacturer "is a person or company 'who regularly, and in the course of their principal business, create[s], assemble[s] and/or prepare[s] goods for sale to the consuming public.'" *Scordino*, 662 So. 2d at 645 (quoting *Olson v. Ulysses Irrigation Pipe Co.*, 649 F. Supp. 1511 (D. Kan. 1986)). *See also Lawson v. Honeywell Int'l, Inc.*, 75 So. 3d 1024, 1028-29 (Miss. 2011). "In other words a manufacturer produces goods as a principal part of its business and sells them either directly or for resale to the consuming public." *Id.*

[15] A seller is "a person who sells or contracts to sell goods." *Scordino*, 662 So. 2d at 643 (citing *Volkswagen of America, Inc. v. Novak*, 418 So. 2d 801, 804 (Miss. 1982)). The Restatement "further defines a seller as any person engaged in the business of selling products for use or consumption. It is not necessary that the seller be engaged solely in the business of selling a specific product; however, the seller must not be an occasional seller of the product." *Id.* (citing Restatement (Second) of Torts § 402A cmt. f).

warnings."[16] Miss. Code Ann. § 11-1-63(a)(i)(2). Therefore, manufacturers and sellers have "a duty, as a matter of law, to warn of any known hazards" associated with their products. *Scordino*, 662 So. 2d at 646 (citing *Swan v. I.P., Inc.*, 613 So. 2d 846 (Miss. 1993)).

To establish the existence of a product defect based on inadequate warning, the plaintiff must show that at the time the product left the control of the manufacturer or seller: (1) "the manufacturer or seller knew or in light of reasonably available knowledge should have known about the danger," and (2) "that the ordinary user or consumer would not realize its dangerous condition." Miss. Code. Ann. § 11-1-63(c)(i). Additionally, the plaintiff in a failure to warn case "must prove that the alleged defective warnings rendered the product unreasonably dangerous to the user or consumer; and that this condition proximately caused the damages for which recovery is sought." *3M Co. v. Johnson*, 895 So. 2d at 166 (citing Miss. Code Ann. § 11-1-63(a)(ii)-(iii)).

> A key element of causation for a failure-to-warn claim is proof of a causal link between the plaintiffs' injuries and the product's allegedly lacking a warning or having an inadequate warning. In other words, the failure to warn must be the proximate cause of the injuries suffered or it is irrelevant.[17]

*Id.* (citing *Garner v. Santoro*, 865 F.2d 629, 641, 642 (5th Cir. 1989)).

A claim for failure to warn may be based on the theory of negligence or strict liability in tort. *O'Flynn v. Owens-Corning Fiberglas*, 759 So. 2d 526, 535 (Miss. Ct. App. 2000). "The

---

[16] *See also Swan v. I.P., Inc.*, 613 So. 2d 846, 852 (Miss. 1993) ("Lack of an adequate warning is a defect which makes a product unreasonably dangerous for strict liability purposes." (citations omitted)). The MPLA defines an adequate warning as

> one that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger and that communicates sufficient information on the dangers and safe use of the product, taking into account the characteristics of, and the ordinary knowledge common to an ordinary consumer who purchases the product[.]

Miss. Code Ann. § 11-1-63(c)(ii).

[17] In *3M Co. v. Johnson*, the court rejected the plaintiffs' failure to warn claim because they "did not demonstrate that any 'missing' warning caused the injury."*3M Co. v. Johnson*, 895 So. 2d at 166.

strict liability in tort theory is derived from *State Stove Manufacturing Co. v. Hodges*, and section 402A of the Restatement (Second) of Torts. The negligence theory is derived from section 388 of the Restatement (Second) of Torts." *Id.* By proving the required elements in a failure to warn cause of action,

> the plaintiff is in effect proving that the defendant was negligent in its failure to warn. Hence, even though the cause of action for failure to warn could be based on negligence or strict liability in tort, the two theories, while conceptually different, often merge into a single breach of duty.

*Id.* (citation omitted).

> Mississippi courts recognize that a manufacturer's duty to warn is not unlimited.

> The Mississippi Product Liability Act speaks only of dangers known as of the time the product leaves the control of the manufacturer or seller. Creating a post-sale duty to warn appears to conflict with the language of this statute. The legislature has not revised the statute in question and in the absence of such revision, we will not now create a post-sale duty to warn.

*Noah v. GMC*, 882 So. 2d 235, 239 (Miss. Ct. App.) (citation omitted), *cert. denied*, 882 So. 2d 772 (Miss. 2004). *See also Murray v. GM, L.L.C.*, 478 Fed. Appx. 175, 182 (5th Cir. 2012) (explaining that there is "no post-sale duty to warn under Mississippi law").

#### 4. The Bare Metal Defense Under Mississippi Law

Based upon Mississippi's product liability statute, Section 402A, and case authority, it is reasonably likely that the Supreme Court of Mississippi would follow the majority of jurisdictions that have refused to find defendants liable for other manufacturers' asbestos products.[18] *See, e.g.*, *Murray*, 478 Fed. Appx. at 182 (observing that there is "no post-sale duty to warn under Mississippi law"); *Scordino*, 662 So. 2d at 643 (explaining that "strict liability [] depends upon[] . . . whether the defendant is a manufacturer or seller in the business of selling a

---

[18] It should be noted that Plaintiffs offer no argument as to why Mississippi would not follow the majority trend.

defective product"); *Harmon*, 720 F. Supp. at 80 (holding that "strict liability for injury caused by a defective product is not to be imposed on one who neither manufactures nor sells the products"). Indeed, the Supreme Court of Mississippi has observed that the purpose of imposing liability for defective products "'is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves.'" *State Stove Mfg. Co.*, 189 So. 2d at 120 (quoting *Greenman v. Yuba Power Prods., Inc.*, 377 P.2d 897, 901 (Cal. 1963)). Given Mississippi's existing case authority, and the persuasive weight of decisions from other jurisdictions declining to impose liability, the Supreme Court of Mississippi would likely find that a manufacturer is not subject to a duty to warn or protect against hazards arising from a product it did not manufacture, supply, or sell.

## C. Analysis of the Defendants' Summary Judgment Motions

### 1. Defendant Foster Wheeler

Previously, the MDL Court denied Foster Wheeler's motion for summary judgment, relative to product identification and causation, on the ground that Plaintiffs had "raised a genuine issue of material fact as to whether Mr. Dalton was frequently and regularly exposed to asbestos from Foster Wheeler steam generators." *Dalton v. 3M Co.* (*Foster Wheeler*), 2011 WL 5881178, at *1 n.1. However, the MDL Court remanded to this court the issue of whether Mississippi would recognize the bare metal defense. *Id.* As it has been determined that the Mississippi Supreme Court would likely adopt the bare metal defense, the relevant inquiry becomes whether that defense shields Foster Wheeler from liability. Consequently, in order to prevail on summary judgment, Foster Wheeler must demonstrate an absence of any material facts, specifically, that it did not supply the asbestos-containing products to which Mr. Dalton

was exposed. To the extent Foster Wheeler is successful, the Plaintiffs must establish specific facts showing there is a genuine issue for trial. *See Matsushita*, 475 U.S. at 587.

The Plaintiffs' claims against Foster Wheeler relate to Mr. Dalton's alleged exposure to external asbestos insulation that was applied to Foster Wheeler's steam generators. Foster Wheeler contends summary judgment is proper because Plaintiffs fail to show that Mr. Dalton's injuries were caused by exposure to asbestos-containing products that Foster Wheeler supplied. (D.I. 38 at 1) The Plaintiffs counter that Foster Wheeler is liable for failing to warn Mr. Dalton of the hazards of asbestos because Foster Wheeler supplied external asbestos insulation for use upon its steam generators, and Foster Wheeler produced design manuals that specified the use of external asbestos insulation on its steam generators. (D.I. 53 at 22; 11/27/12 Tr. at 38-40)

I recommend that the court grant Foster Wheeler's motion for summary judgment because there are no genuine issues of material fact in dispute concerning whether Foster Wheeler supplied the asbestos insulation to which Mr. Dalton was exposed, even when viewing the evidence in the light most favorable to the Plaintiffs. The record reflects that Mr. Dalton's asbestos exposure, as it relates to Foster Wheeler, was limited to the external insulation on Foster Wheeler's steam generators.[19] (D.I. 1, Ex. 3-3 at 199, 226) However, there is no evidence demonstrating that Foster Wheeler supplied this external insulation. In contrast, Foster Wheeler has submitted evidence showing that it supplied only internal insulation, which was installed between the tubes, bricks, and inner steel plate of the steam generator casings. (D.I. 53, Ex. 30 at 27; D.I. 58, Ex. C at 27-28)

---

[19] The external asbestos insulation was applied to Foster Wheeler's steam generators after they were delivered to Ingalls Shipyard and installed upon ships. (D.I. 1, Ex. 3-1 at 41; *Id.*, Ex. 3-3 at 226)

Furthermore, the Plaintiffs' contention that Foster Wheeler supplied asbestos insulation for external use is not supported by the record. The Plaintiffs' claim is based substantially on selected responses to general questions taken from the deposition testimony of Thomas Schroppe[20] ("Mr. Schroppe"), Foster Wheeler's witness. (*See* D.I. 53 at 22; 11/27/12 Tr. at 37-40) Although Mr. Schroppe confirms that Foster Wheeler purchased and shipped asbestos materials to shipyards for use with Foster Wheeler steam generators[21] (D.I. 53, Ex. 30 at 38; *Id.*, Ex. 33 at 126-29), there is no evidence to show, as the Plaintiffs contend, that this insulation was applied to the steam generators externally. In contrast, Mr. Schroppe repeatedly emphasized that the asbestos insulation Foster Wheeler supplied was used only to insulate the steam generators internally. (*See* D.I. 58, Ex. C at 27; *Id.*, Ex. D at 145) Therefore, the court should grant Foster Wheeler's motion because the Plaintiffs have not shown that Foster Wheeler supplied the external asbestos insulation used on its steam generators, and Foster Wheeler cannot be held liable for injuries caused by products it did not supply.[22]

Similarly without support is the Plaintiffs' contention that Foster Wheeler "produced design manuals and sheet lists . . . which specified the use of asbestos insulation on its [steam

---

[20] Mr. Schroppe agreed that he is "the person most knowledgeable with regard[] to the relationship between Foster Wheeler and the Navy for marine boilers." (D.I. 53, Ex. 31 at 55)

[21] Notably, Mr. Schroppe's testimony regarding Foster Wheeler's purchase and supply of asbestos insulation was in response to general questioning and did not relate specifically to the ships on which Mr. Dalton worked. (*See* D.I. 53, Ex. 30 at 38)

[22] Although Mississippi recognizes an exception to this rule, expressed in the Restatement (Second) Torts § 400, that "one who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer," *Swift & Co. v. Hawkins*, 174 Miss. 253, 164 So. 231 (1935), the exception is inapplicable under the facts presented in this case.

generators]."[23] (D.I. 53 at 22) The Plaintiffs rely upon the testimony of Mr. Schroppe in support

of this claim. (D.I. 53 at 10-11, 22) However, Mr. Schroppe's testimony demonstrates that the

purported design manuals and sheet lists were not Foster Wheeler internal specifications. Rather,

the manuals and lists described third-party products that were generally available in the industry

at that time. (D.I. 53, Ex. 31 at 60-61[24]; *Id.*, Ex. 32) The Plaintiffs' position is further undermined

by Mr. Schroppe's testimony that Foster Wheeler steam generators "were never insulated

externally."[25] (D.I. 58, Ex. D at 145) Moreover, the record indicates that external asbestos

insulation was applied to steam generators at the direction of the lead design shipyard, Electric

Boats, in Groton, Connecticut. (*See* D.I. 38, Ex. B at 203-05[26]; 11/27/12 Tr. at 20) Therefore, the

---

[23] Some of the deposition testimony that Plaintiffs cite in support of this assertion is not included in the record. Specifically, "Ex.31, [sic] p. 99-100." (D.I. 53 at 11)

[24] Mr. Schroppe testified, in pertinent part:

> Q:   But the Navy would put these specifications out, they would tell Foster Wheeler in the course of the biding [sic] process this is what we are looking for, the insulation has to meet 2819 [specifications], right?
>
> . . .
>
> A:   I don't believe this represents the entire picture.
>
> Q:   And then what Foster Wheeler would do is they would go through and they would have -- Foster Wheeler had their own internal list about products in 2819 didn't they?
>
> A:   They had a compilation of what was available in the industry, not their own internal specifications, if you will.
>
> Q:   They didn't have a technical design manual that listed the manufacturers of products that met 2819?
>
> A:   But it was not a Foster Wheeler spec. It was just a listing of everything that was available in the industry.
>
> Q:   Okay, but it's a Foster Wheeler document, they had access to it internally?
>
> A:   It was a book that had FW on it and internally it was everything that came from the industry.

(D.I. 53, Ex. 31 at 60-61)

[25] Mr. Schroppe also testified that the outer casing of a Foster Wheeler steam generator "is never insulated, it's plain steel." (D.I 58, Ex. C at 27)

[26] Mr. Dalton testified:

court should grant Foster Wheeler's motion for summary judgment because the Plaintiffs have not shown that Foster Wheeler required external asbestos insulation on its steam generators.

## 2. Defendant Crane

I recommend that the court grant in part and deny in part Crane's motion for summary judgment.

The Plaintiffs' claims against Crane relate to Mr. Dalton's alleged exposure to asbestos from valves and pumps that Crane produced. Crane argues that summary judgment is appropriate because the Plaintiffs fail to show that Mr. Dalton's injuries were caused by exposure to asbestos-containing products that Crane manufactured or supplied. (D.I. 44 at 1) The Plaintiffs counter that Crane is liable for failing to warn Mr. Dalton about the hazards of its products, which were "designed, marketed, and sold . . . specifically for use with [asbestos] insulation." (D.I. 53 at 19) The Plaintiffs further contend that Crane is liable because Mr. Dalton was exposed to asbestos-containing gaskets and packing supplied by Crane inside its pumps. (*Id.*)

### i. Crane Valves

The court should grant Crane's motion for summary judgment as to the Plaintiffs' claims concerning Crane valves because the Plaintiffs have not established that Crane designed its valves to require external asbestos insulation. The record reflects that that Crane valves arrived at the shipyard with no external asbestos insulation. (D.I. 1, Ex. 3-2 at 138) The bodies of the

A:   We had drawings that required -- called out for insulation to be put on [the steam generators].
Q:   And those drawing were designed by the Navy or by Ingalls Shipyard?
. . .
A:   By Boat EB. . . . That's a submarine shipyard in Groton, Connecticut. That was the lead yard. . . .
Q:   And they were the ones that stated that those machines needed insulation?
. . .
A:   Correct.
(D.I. 38, Ex. B at 204-05)

23

valves were made of metal, and only the external insulation, not the inner packing or gaskets, caused Mr. Dalton to become exposed to asbestos.[27] (*Id.*, Ex. 3-2 at 156-57) However, there is no evidence demonstrating that Crane designed its valves to use external asbestos insulation.

The only evidence proffered by Plaintiffs in support of their claim is insufficient to withstand summary judgment. Specifically, the Plaintiffs submitted catalogs, allegedly produced by Crane, that depict the use of various asbestos components inside Crane valves. (*See* D.I. 53, Exs. 8, 9, 10, 11, 12, 15) The catalogs, however, are undated, and the Plaintiffs do not even assert that the valves depicted in the catalogs are the same valves with which Mr. Dalton worked.[28] Moreover, all of the asbestos components depicted in the catalogs relate to Crane valves internally. The Plaintiffs do not direct the court to any document in which Crane requires or recommends external insulation. Even when viewing the evidence in the light most favorable to the Plaintiffs, no reasonable person could conclude that Crane designed its valves to require external asbestos insulation. Therefore, the court should grant Crane's motion for summary judgment, limited to the Plaintiffs' claims concerning Crane valves.

### ii.  Crane Pumps

The court should deny Crane's summary judgment motion with respect to Crane's liability for Mr. Dalton's injuries allegedly caused by asbestos-containing gaskets and packing in

---

[27] The Plaintiffs do not contend that Crane supplied the external asbestos insulation applied to its valves. (*See* 11/27/12 Tr. at 38)

[28] Notably, courts in other asbestos cases have found evidence similar to that which Plaintiffs present here unpersuasive in the context of summary judgment. *See, e.g.*, *In re Asbestos Litig. (Parente)*, 2012 WL 1415709 (Del. Super. Ct. Mar. 2, 2012); *In re Asbestos Litig. (Davis)*, 2011 WL 2462569 (Del. Super. Ct. June 7, 2011).

Crane pumps.[29] The Plaintiffs have presented circumstantial evidence showing that Crane supplied the original, internal asbestos-containing gaskets and packing in its pumps, and that Mr. Dalton was exposed to this asbestos. Mr. Dalton testified that when Crane pumps failed, they required the removal and replacement of their internal asbestos gaskets and packing.[30] (D.I. 1, Ex. 3-1 at 29, 30-33) Mr. Dalton was present during the pump repair process, and testified that the removal and replacement of gaskets and packing from failed pumps generated asbestos dust. (*Id.*, Ex. 3-1 at 30-33) Mr. Dalton further explained that if a failed pump had passed initial receipt inspection, there would have been no work done to the internal components of that pump prior to him working on it. (*Id.*, Ex. 3-3 at 373) Viewed in the light most favorable to the Plaintiffs, the jury or fact finder could decide that Crane supplied the original, asbestos-containing gaskets and packing inside its pumps, which raises a genuine issue of material fact with respect to Crane's liability for Mr. Dalton's injuries. Therefore, the court should deny Crane's summary judgment motion with respect to Mr. Dalton's injuries allegedly caused by exposure to asbestos gaskets and packing in Crane's pumps.

## V.   CONCLUSION

For the foregoing reasons, I recommend that the court grant Foster Wheeler's motion for summary judgment, and grant in part and deny in part Crane's motion for summary judgment.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation.

---

[29] Crane cannot be held liable for Mr. Dalton's injuries allegedly caused by external asbestos insulation applied to its pumps because there is no evidence Crane designed its pumps to require such insulation. *See supra* Section IV(C)(2)(i).

[30] Mr. Dalton remembered having repaired Crane pumps specifically, but did not recall whether he had worked with the packing inside Crane pumps. (D.I. 1, Ex. 3-2 at 159, 161-62)

Fed. R. Civ. P. 72(b)(2). The objections and responses to the objections are limited to ten (10) pages each. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court. *See Sincavage v. Barnhart*, 171 F. Appx. 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the court's Standing Order in Non-Pro Se Matters for Objections Filed Under Fed. R. Civ. P. 72, dated November 16, 2009, a copy of which is available on the court's website, www.ded.uscourts.gov.

Dated: September 12, 2013

Sherry R. Fallon
United States Magistrate Judge